1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DANIEL CHAMBERS,

               Plaintiff,

  v.

SANTA CLARA COUNTY, *et al.*,

               Defendants.

_____/

No. C 05-3308 SI

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

On November 16, 2007, the Court held a hearing on defendants' motion for summary judgment. The Court has reviewed the parties' papers and the voluminous record in this case,[1] and for the reasons set forth below, GRANTS defendants' motion.

**BACKGROUND**

Plaintiff Daniel Chambers, a former dependent of the Santa Clara County Juvenile Court, filed this action in pro per alleging various federal civil rights and state tort violations. Plaintiff has sued the County of Santa Clara ("County") and 27 County officials and employees, including County social workers, attorneys involved in the dependency proceedings, the County Board of Supervisors, and current and former directors of the Santa Clara County Social Services Agency ("SSA"). At the heart

[1] Plaintiff's opposition suggests that the record is incomplete because plaintiff's mother and her fiancé, Charles Wittman, "are primary witnesses with the most answers and proof to the actions and inactions of the defendants, and to date neither have been deposed for plaintiff's case." Opposition at 9. The Court notes that plaintiff's mother and Mr. Wittman have been present for every court appearance and have been involved throughout this case, and both submitted declarations in opposition to the motion for summary judgment. The Court finds that the extensive evidentiary record is sufficient to rule on the instant motion.

United States District Court
For the Northern District of California

of this case is plaintiff's claim that defendants destroyed his family when social workers wrongfully removed plaintiff and his three siblings from the custody of their mother. Plaintiff alleges that the social worker defendants lied to the juvenile court, and that all defendants conspired to prevent plaintiff from being reunited with his mother.

The events giving rise to this case began in 1999, when plaintiff, who was thirteen years old at the time, and his siblings were removed from their mother's custody[2] and placed into protective custody. The events precipitating the removal of plaintiff and his siblings are as follows. On April 19, 1999, plaintiff's nine year old sister, M., told her mother that her eleven year old brother, J., had sodomized her. Miles Aff. Ex. A (Jurisdiction Hearing Report at 729[3]). M. also told her mother that J. and plaintiff had forced her to watch while they orally copulated each other to see "who could suck the longest." *Id.*[4] On April 20, 1999, plaintiff's mother contacted Bascom Mental Health to inquire about counseling services for the children, and Child Protective Services and the Los Gatos Police became involved. *Id.* at 729-30. That same day, Los Gatos Police Department officers interviewed M., J., and plaintiff. M and J. told officers that J. had sodomized M. *Id.* at 821 (police report). M., J. and plaintiff also confirmed that J. and plaintiff had orally copulated each other, and that M. had been forced to watch. *Id.*

In April 1999, defendant Kathleen (Dudley) Miles was working as a Dependency Intake Social Worker in the Dependency Intake Unit at the Santa Clara County Department of Family and Children's Services. Miles Aff. ¶¶ 2-3. Miles was responsible for investigating and assessing allegations of child abuse and neglect, and she was assigned to plaintiff's case. According to the Jurisdiction Hearing Report prepared by Miles for the juvenile court, M. told Miles that plaintiff had also sodomized her. *Id.* at 730. The report states that although plaintiff denied sodomizing M., he admitted to forcing M. to

---

[2] At the time, plaintiff's mother was living with her boyfriend, Charles Wittman. Plaintiff's mother had custody of her four children: J., plaintiff, M. and I. J and plaintiff have the same biological father, and M. and I. have different biological fathers.

[3] This Order refers to the bates-stamp page numbers of these exhibits. Several exhibits are not bates-stamped; references to those exhibits are to the original page numbers.

[4] Plaintiff's third sibling, I., was one year old. There was no allegation of sexual activity involving I.

orally copulate him on one occasion. *Id*. at 735-36. The Report states that when Miles contacted plaintiff's mother by telephone, plaintiff's mother stated that anal intercourse between J. and M. was "consensual," "an experiment," "it happens in families but families need help," and that M. and J. "bargained for it, it was a child like game." *Id*. at 736.

On April 20, 1999, M. was placed into protective custody. *Id*. at 722. Several days later, the juvenile court held a detention hearing and ordered M. detained and that she have no contact with J. or plaintiff.[5] *Id*. On April 20, 1999, plaintiff's brother J. was placed in juvenile hall due to charges that he had forced anal intercourse with M. on at least three occasions in March 1999. *Id*. at 723. On June 18, 1999, J. was released from juvenile hall and placed in protective custody. *Id*. On June 21, 1999, the juvenile court held a detention hearing and ordered J. detained.[6] *Id*.

On May 7, 1999, plaintiff's one-year old sister, I., was placed in protective custody pursuant to a warrant petition based on her mother's failure to protect her children (M., J., and plaintiff) from being sexually abused, and her mother's history of leaving the area when authorities would intervene. *Id*. at 722. On May 11, 1999, the juvenile court held a detention hearing and ordered I. detained.[7] *Id*.

On May 14, 1999, Miles filed a petition on behalf of plaintiff in the juvenile court. Miles Aff. Ex. B. The petition raised allegations with regard to the incest between plaintiff, J., and M., and alleged, among other things, that plaintiff had been or there was a substantial risk that he would be sexually abused by a member of his household. On May 20, 1999, plaintiff was placed into protective custody at the Children's Shelter pursuant to the protective-custody warrant. On May 26, 1999, the juvenile court held a detention hearing and ordered plaintiff detained. Defendants' Request for Judicial Notice, Ex. D (May 26, 1999 Minute Order).

At the time that plaintiff was taken to the Children's Shelter on May 20, 1999, he claims that he was living with family friends, Chris and Alicia Patterson, and that he was not living with his mother. It is undisputed, however, that at the time that plaintiff was taken to the Children's Shelter, plaintiff's

---

[5] Custody of M. was eventually awarded to her biological father, who lived in Georgia.

[6] Like plaintiff, J. was eventually placed in the foster care system.

[7] I. was eventually adopted.

United States District Court
For the Northern District of California

1    mother had custody of plaintiff and plaintiff and the Pattersons did not have any legal relationship.  The

2    same day plaintiff was taken to the Children's Shelter, Miles contacted Chris Patterson to discuss

3    whether he and his wife wanted to become licensed foster parents and to explain the steps to do so.

4    Miles Aff. Ex. F (May 20, 1999 Services Documentation Log).  On May 28, 1999, the Pattersons called

5    Miles to inform her that they had not yet completed a foster care application but that they would call to

6    get an application that day.  *Id*. (May 28, 1999 Services Documentation Log).  On June 11, 1999,

7    plaintiff was released from the Children's Shelter and placed with the Pattersons, who had been certified

8    for foster placement.  *Id*. (June 11, 1999 Services Documentation Log).

9            Plaintiff claims that during the month he spent at the Children's Shelter, he was attacked by other

10   residents and that the staff was "neglectful."  In his deposition, plaintiff described the following events:

11   (1) an unknown shelter resident allegedly slammed his finger in a door; (2) an unknown shelter resident

12   allegedly walked up behind him and put a shirt around plaintiff's neck and tried to strangle him; (3) an

13   unknown shelter resident allegedly grabbed plaintiff and "threw him around"; and (4) an unknown

14   shelter resident allegedly watched plaintiff play chess with a shelter counselor and then grabbed plaintiff

15   from behind and wrapped his arm around plaintiff's neck before the counselor pulled the resident away.

16   Kiniyalocts Aff. Ex. E at 39-50.[8]  Plaintiff alleges that the staff was neglectful because they seemed

17   unconcerned by the attacks, although he acknowledged that the Shelter had a disciplinary system and

18   that counselors physically or verbally intervened when they witnessed attacks.  *Id*.  Plaintiff also alleges

19   that the staff was "neglectful" because "if you had a CD player or something like that, it was locked

20   away in the cabinet to keep it from getting stolen.  And if you needed it, you were just supposed to be

21   able to go to the counselor and, oh, I need this, this or whatever.  And the counselors would a lot of time

22   be like, I'm watching the game.  I'll do it when the game is over type thing."  *Id*. at 48.  Plaintiff alleges

23   that he told Miles about the attacks and the neglectful Children's Shelter staff, and that she did not take

24   any action.

25

26

27

28         [8]  Although plaintiff is appearing pro se, he was represented by an attorney at his deposition.

United States District Court
For the Northern District of California

4

On March 20, 2000,[9] the juvenile court admitted Dudley's June 23, 1999 Jurisdictional/Dispositional Report, attachments, and all addenda into evidence and took jurisdiction over all four children after finding that the allegations in the petition were true.  Defendants' Request for Judicial Notice Ex. I (March 20, 2000 Minute Order).  The allegations that the court found true included, *inter alia*, (1) that M. disclosed to police officers that J. had anally penetrated her at least three times; (2) that plaintiff and J. had forced M. to watch them orally copulating each other; (3) that M. had complained of vaginal pain since she was approximately five years old and currently had vaginal pain and a visible vaginal sore; (4) that plaintiff forced M. to orally copulate him in 1994; (5) that plaintiff's mother stated that anal intercourse between J. and M. was "consensual"; (6) that plaintiff's mother stated that M. had been molested by I.'s father and a boy; (7) that plaintiff's siblings had access to pornographic literature and videos in the house that plaintiff's mother shared with Mr. Wittman; (8) that J. was severely emotionally disturbed and had an extensive history of psychiatric hospitalizations and treatment and had expressed that he wanted to kill himself and his family; (9) plaintiff's siblings had sporadic school attendance as the family had moved at least nine times since 1989[10]; (10) that plaintiff's mother had left M. for approximately two months in Sonoma, California in 1994 without providing care for M. in order to "take care of personal business" in North Carolina; and (11) M. stated that she was fearful of returning home as long as J. and plaintiff were there, and that M. stated that plaintiff "is going to kill me."  *Id*. Ex. J at 365-66.

On June 12, 2000, the juvenile court held a dispositional hearing to determine the placement for plaintiff.  *Id*. Ex. K (June 12, 2000 Minute Order).  The court ordered that plaintiff remain with the Pattersons, and that plaintiff and his mother have weekly supervised visits and weekly phone contact with his father.  *Id*.  The court did not order sibling visitation.

---

[9]   Prior to the jurisdictional hearing, the parties participated in an unsuccessful mediation. Defendants' Request for Judicial Notice, Ex. H (June 23, 1999-March 14, 2000 Minute Orders). Thereafter the court set the matter for trial, which was continued several times due to plaintiff's mother retaining new counsel.  *Id*.

[10]   As detailed in Miles' report for the juvenile court, the children had moved at least 9 times between 1989 and 1999, and had been separated from each other and from their mother and fathers at various times.  Miles Aff. Ex. A at 740.  The report stated that plaintiff, M. and J. had had unstable and inconsistent school attendance, with numerous unexcused absences and significant periods of time showing no record of enrollment.  *Id*. at 740-45.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    After the dispositional hearing, plaintiff's case was assigned to new social worker, defendant

2    Vicky Saiprasert.[11]  Saiprasert submitted a July 12, 2000 Interim Review Report to the juvenile court

3    in which she reported,

> Daniel continues to do well in his foster home.  He successfully graduated from 8th
> grade and will be going to high school in the fall. [Daniel] was able to maintain honor
> roll marks during the past four semesters.  He appears to have made many friends
> through school and tries very hard to be a "normal teenager."
>
> Daniel recently stated to both his therapist and the undersigned that he does not want to
> reunify with his mother.  Daniel stated that he would like to remain in the Pattersons'
> home and be adopted by them.  The Pattersons stated they would be willing to do
> anything that was in Daniel's best interest, including adoption.  Daniel has expressed
> fear and anxiety about his mother's response to his decision.  It would not be appropriate
> for Ms. Mah to discuss this issue with Daniel, as he has stated that he does not feel
> comfortable about telling his mother.

Saiprasert Aff. Ex. L at 432-33.  On July 17, 2000, the juvenile court admitted Saiprasert's report into

evidence and ordered its prior orders regarding plaintiff's placement with the Pattersons, counseling,

and visitation were to remain in effect.  Request for Judicial Notice Ex. M (July 17, 2000 Minute Order).


    Plaintiff's case was then transferred to defendant social worker Barbara Eddy, who was also

assigned to plaintiff's sisters' cases.  In a December 11, 2000 status report, Eddy reported that plaintiff

was doing well in school and that he was happy in his placement with the Pattersons.  Eddy also

reported that plaintiff was making progress in therapy, and that he had been discussing his molestation

of M. and "recognizes the damage he has done to his sister." Eddy Aff. Ex. N at 476.  Eddy noted that

plaintiff's therapist reported that "she has concerns about Charlie Wittman [plaintiff's mother's

boyfriend]." *Id*. at 477.  According to the report, Daniel told the therapist that "Charlie slips me money"

without telling plaintiff's mother.  *Id*.  Eddy also reported,

> Daniel visits his mother once per week, supervised by [a social worker].  According to
> [the social worker], at first the mother would ask inappropriate, intrusive questions and
> not really pay attention to what Daniel was saying. But now, the visits seem appropriate.
> [The social worker] stated he contacted Daniel's therapist . . . regarding changing the
> location of the visits as the visits seemed to be stable. [The social worker] stated that
> after conferring with the therapist, they agreed that the mother treats Daniel as a peer,
> not as a parent, during the visits. [The therapist] stated that [it] is an unhealthy
> relationship that has not changed and would need to change for the visits to be

---

[11] Miles was no longer plaintiff's social worker because the case had reached disposition. Miles
Aff. ¶ 15.  Plaintiff's case was transferred to a "continuing" social worker. Saiprasert Aff. ¶ 3.

unsupervised. [The therapist] recommended that the visits remain supervised at this time. *Id*. at 483. Eddy recommended termination of reunification services for plaintiff, and that "an appropriate permanent plan for him would be either adoption or guardianship with his present foster parents." *Id*. Eddy also recommended reducing the visits between plaintiff and his mother to once a month, supervised, with the discretion to move to unsupervised visits upon consultation with therapists. *Id*.

At a December 11, 2000 status hearing, the juvenile court admitted Eddy's status report into evidence, continued plaintiff's placement with the Pattersons, terminated family reunification services for plaintiff and his mother,[12] and reduced plaintiff's visitation with his mother to three times per month, supervised. Request for Judicial Notice, Ex. O (December 11, 2000 Minute Order). The court also found that visitation with plaintiff's boyfriend, Charlie Wittman, was detrimental to plaintiff's well-being, and ordered no visitation with Mr. Wittman. *Id*. The court did not order any sibling visitation. *Id*.

In a report dated February 9, 2001, Eddy provided the juvenile court with a further update on the status of plaintiff's visits with his mother. *Id*. Ex. P. Eddy recommended that there be no change in plaintiff's visitation with his mother. *Id*. at 4. Eddy's report stated,

> Therapist's Letter
> On 1/7/01, [plaintiff's therapist] submitted a letter to this worker with her recommendations regarding the visits between Daniel and his mother. She stated that the supervised visits of once a week with his mother should continue. She stated that Daniel had told her that he wanted no changes in the visitation orders. She stated, "The purpose of the ongoing supervision is to help Daniel to shift from his position as the parentified child and for both he and his mother to practice more appropriate mother and son interactions."
>
> [Report states that during a January 12, 2001 supervised visit, plaintiff's mother asked about having unsupervised visits]
>
> Following this visit, Daniel came to the office 1/16/01 to see this worker regarding the plan of guardianship and visitation. Daniel clearly did not want to be there. He stated angrily that he wanted unsupervised visits and that he always told everyone that he wants unsupervised visits. This worker reminded him that he had told his therapist and this worker when asked about visits that he wanted no changes. He said that no one ever listens to him and that he wants unsupervised visits. This worker explained to Daniel

---

[12] Plaintiff's opposition states that after the juvenile court terminated plaintiff's mother's reunification services, plaintiff's mother filed a petition to set aside the court's order. Opposition at 22-23. According to the opposition, the juvenile court denied the petition.

United States District Court
For the Northern District of California

that the reason for the supervised visits is to work on the mother-son relationship, that his mother treats him more as a peer. He frowned and said that was OK. He stated that his foster parents were his parents now – "I don't need the mother relationship with her." This worker told Daniel that the recommendation of supervised visits as stated by his therapist would be stated to the Court.   Daniel's foster mother and father both stated they would also recommend that the visits remain supervised.

. . .

Prior to the visit of 1/12 when the mother expressed her wish to Daniel that the visits be unsupervised, Daniel had indeed told this worker and his therapist that he was happy with the way things were and he did not want them to change. The dramatic change in his demeanor and attitude consisted of anger that the professionals were not doing what his mother wanted. The difference within one week is very apparent in the two visits as Daniel changed from comfortable and relaxed to angry and frustrated. His therapist observed that he considers himself to be the parent in this family and that he considers himself his mother's protector. . . . I concur with [the therapist] that both the mother and Daniel are too unstable at this time to have unsupervised visits.

*Id.* at 2-4; *see also* letters from therapists attached to Eddy's report.  In an addendum to the February 9, 2001 report, Eddy informed the court that both the therapist who supervised plaintiff's visits with his mother and plaintiff's foster mother expressed concern that plaintiff's mother was trying to talk to plaintiff unsupervised during their visits, and appeared to be attempting to influence plaintiff to request unsupervised visits.  *Id.* Ex. Q.  On February 28, 2001, the juvenile court admitted Eddy's reports into evidence and ordered that its prior orders regarding plaintiff's placement, counseling, and visitation, were to remain in effect.  Request for Judicial Notice Ex. R (February 28, 2001 Minute Order).

On April 6, 2001, Eddy filed a report pursuant to California Welfare and Institutions Code § 366.26.[13]  Eddy Aff. Ex. S.  Eddy recommended that the juvenile court appoint the Pattersons as plaintiff's legal guardians.  Eddy's report noted that plaintiff was doing well in school, and that he had made such progress only since his placement with the Pattersons.  "Previous reports relate his past poor behavior, failing grades, many absences, and moves from school to school while living with his mother."  *Id.* at 3.  Eddy's report stated, *inter alia*, that plaintiff stated he did not want any contact with I. or M., that plaintiff and the Pattersons had a close relationship, and that plaintiff had told Eddy that the Pattersons "are my parents."  *Id.* at 5, 7.

On April 6, 2001, the juvenile court admitted Eddy's report into evidence, found that legal

---

[13]  This statute requires a juvenile court to hold a hearing for children adjudged dependent children to select a permanent plan of either adoption, legal guardianship, or long-term foster care.

8

United States District Court
For the Northern District of California

1  guardianship was in plaintiff's best interest, and appointed the Pattersons as plaintiff's legal guardians.

2  Request for Judicial Notice, Ex. T (April 6, 2001 Minute Order).  The court permitted plaintiff to have

3  monthly supervised visits with Mr. Wittman if plaintiff wished, continued plaintiff's supervised monthly

4  visits with his father, and did not order any sibling visitation.  *Id.*  The court continued the issue of the

5  mother's visitation until April 27, 2001, and on that date, ordered that the mother's prior visitation order

6  (supervised, three times per month) remain in effect.  *Id.* Ex. U (April 27, 2001 Minute Order).

7       In a status report dated October 9, 2001, Eddy reported that plaintiff's mother had not been

8  visiting plaintiff for several months due to her refusal to contact Eddy to discuss appropriate topics for

9  his visits "as she had been telling him he could go home with her if he did not like living at the home

10  of his guardians." *Id.* Ex. V at 3.  Eddy reported that visits had resumed in July 2001, and that plaintiff's

11  mother acted appropriately during that visit.  *Id.*  Eddy's report also stated that plaintiff was aware of

12  his "mother's attempt to kidnap his half sibling, [I.]" *Id.*[14]  The report further stated,

13       At present, visitation between Daniel and his mother are once a month, at the mother's
        request.  However, Daniel has stated that he would like more visits.  This worker
14       proposed that they have a few more supervised visits to see how things go and perhaps
        they could be increased then.  He has also stated that he would like to have visits
15       unsupervised, however, in light of the recent attempted kidnaping of [I.], this worker
        feels that will need to be carefully considered.
16
  *Id.* at 5.
17
18       At the November 13, 2001 status hearing, the juvenile court admitted Eddy's report into

19  evidence and found that plaintiff's legal guardianship with the Pattersons continued to be the most

20  appropriate placement for plaintiff.  Request for Judicial Notice, Ex. W (November 13, 2001 Minute

21  Order).  The court further ordered a reduction in the mother's visitation to one one-hour supervised visit

22  per month.  *Id.*  The court did not order any sibling visitation.

23       On November 13, 2001, defendant Hong Nguyen was assigned as plaintiff's social worker.

24  Nguyen Aff. ¶ 3.  In status reports dated May 9, 2002, November 12, 2002, and June 9, 2003, Nguyen

25  reported that plaintiff continued to do well in his placement with the Pattersons.  *Id.* Ex. X, Y and Z.

26  The May 9, 2002 report stated that a case aide had been providing supervised visits for plaintiff and his

27  mother, and that those visits had been going well.  *Id.* Ex. X at 4.  The November 12, 2002 and June 9,

28       [14]  The report does not contain any information regarding this incident.

**United States District Court**
For the Northern District of California

2003 reports stated, *inter alia*, that both plaintiff and the Pattersons reported that their relationship was good, that the Pattersons did not want to adopt plaintiff but wanted to continue their guardianship, and that neither of plaintiff's parents had contacted Nguyen to request family reunification services. *Id.* Ex. Y at 4, Ex. Z at 6.  The June 9, 2003 report also stated, *inter alia*, that plaintiff and the Pattersons reported that plaintiff's mother had been visiting occasionally under the supervision of the Pattersons, and that plaintiff stated he was not interested in visiting other family members at that time. *Id.* Ex. Z at 5.

During status hearings on May 9, 2002, December 5, 2002, and June 9, 2003, the juvenile court admitted Nguyen's reports into evidence, and ordered the continued placement of plaintiff with the Pattersons.  Request for Judicial Notice, Ex. AA.  During each hearing, the court continued plaintiff's visitation with his mother of one supervised visit per month, and did not order any sibling visitation. *Id.*

In a status report dated December 4, 2003, Nguyen reported that the Pattersons had separated and were in the process of getting a divorce. *Id.* Ex. BB at 3.  Nguyen reported that plaintiff had missed two weeks of school and that plaintiff's mother stated that she supported plaintiff's wish to transfer to a continuation high school. *Id.*  Nguyen also reported that plaintiff and Mrs. Patterson had gotten into an argument, and that Nguyen had a meeting with plaintiff, his mother, and Mrs. Patterson to discuss the argument and plaintiff's continued placement. *Id.* at 4.  Nguyen reported that plaintiff stated he wanted to continue living with Mrs. Patterson, and that Nguyen had offered short term counseling services to Mrs. Patterson and plaintiff for them to strengthen and improve their relationship. *Id* at 6.  Nguyen also reported that plaintiff stated that his supervised visitation with his mother was going well, and that he requested unsupervised visitation with his mother, and increased visitation with Mr. Wittman. *Id.* at 7.  Nguyen reported that she contacted plaintiff's attorney to inform her of plaintiff's wishes regarding visitation with his mother and Mr. Wittman. *Id.*  Nguyen also reported that plaintiff requested to have visits with his brother, J., and that Nguyen referred plaintiff to Giaretto Institute for individual counseling issues "to address and resolve his issues and for counseling with [J.] to address and resolve their sexual issues." *Id.*

On December 4, 2003, the juvenile court admitted Nguyen's report into evidence and ordered

United States District Court
For the Northern District of California

the continued placement of plaintiff with Mrs. Patterson.  Request for Judicial Notice, Ex. CC (December 4, 2003 Minute Order).  The juvenile court also ordered that plaintiff could have weekly, unsupervised visits with his mother (four hours each visit) and weekly two hour visits with Mr. Wittman, supervised by plaintiff's mother.  The court did not order any sibling visitation.  *Id.*

Nguyen submitted an interim review report to the juvenile court on February 10, 2004.  Nguyen Aff. Ex. DD.  The report stated that plaintiff, Mrs. Patterson, and plaintiff's mother participated in an emancipation conference on January 1, 2004.  *Id.* at 2-3.  Nguyen reported that plaintiff wanted to go to Mission College after he graduated from high school in June 2004.  *Id.*  Nguyen also reported that Mrs. Patterson was willing to provide a home for plaintiff after he graduated as long as he attended college and had employment.  *Id.* at 3.  The "Emancipation Conference Summary" attached to Nguyen's report states that plaintiff's first choice for housing is to remain with Mrs. Patterson.  *Id.* at 2 (Summary).  Nguyen also reported that plaintiff's mother was "very supportive of Daniel's emancipation plan."  *Id.* at 3.  On February 10, 2004, the juvenile court held an interim review hearing during which it admitted Nguyen's report into evidence and continued plaintiff's placement with Mrs. Patterson.  Request for Judicial Notice, Ex. EE (February 10, 2004 Minute Order).

In a June 3, 2004 status report, Nguyen recommended that the juvenile court terminate dependency jurisdiction for plaintiff because he had reached the age of majority.  Nguyen Aff. Ex. FF at 3-5.  Nguyen reported that she had met with plaintiff and Mrs. Patterson twice since the last status review hearing and that plaintiff's relationship with Mrs. Patterson "has been good."  *Id.*  Nguyen also reported that plaintiff said that his unsupervised visits with his mother were going well.  *Id.* at 5.  Nguyen also reported that she had referred plaintiff for family counseling at the Giaretto Program so he could resolve past issues with his brother, J.  *Id.*  The report states that plaintiff was admitted to the program, but that he was discharged from the program after he cancelled two appointments in a row and could not commit to a rescheduled appointment.  *Id.* at 6.  The report also states that plaintiff told Nguyen that he was not interested in participating in counseling and that he would seek family counseling when he was ready.  *Id.*

On July 12, 2004, the juvenile court admitted Nguyen's June 3, 2004 status report into evidence and terminated dependency jurisdiction for plaintiff.  Request for Judicial Notice Ex. GG (July 12, 2004

11

1   Minute Order and Order of Termination of Dependency Jurisdiction).

2

3                                 **LEGAL STANDARD**

4       Summary adjudication is proper when "the pleadings, depositions, answers to interrogatories,

5   and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any

6   material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.

7   56(c).

8       In a motion for summary judgment, "[if] the moving party for summary judgment meets its

9   initial burden of identifying for the court those portions of the materials on file that it believes

10  demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so

11  that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts

12  showing that there is a genuine issue for trial." *See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors

13  Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).  In

14  judging evidence at the summary judgment stage, the Court does not make credibility determinations

15  or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving

16  party. *See T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio

17  Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991).  The evidence

18  presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony

19  in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary

20  judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

21

22                                 **DISCUSSION**

23  **I.      Claims against social worker defendants**

24       Plaintiff has sued the social workers assigned to his case (Kathleen (Dudley) Miles, Vicky

25  Saiprasert, Barbara Eddy and Hong Nguyen), those social workers' supervisors (Jean Platner, Linda

26  Castaldi, Jonathan Weinberg, James Paulsen, and Patricia Guesick), and his brother J.'s social workers

27  (Izi Chan and Barry Grigsby).  Based upon the second amended complaint, plaintiff's discovery

28  responses, and plaintiff's opposition to defendants' motion for summary judgment, it appears plaintiff

United States District Court
For the Northern District of California

contends that the social worker defendants violated his constitutional rights by engaging in the following alleged conduct:

- Miles allegedly misrepresented in her protective-custody warrant application that plaintiff resided with his mother at Mr. Wittman's address at the time of plaintiff's removal, when in fact plaintiff was living with the Pattersons. Plaintiff contends that he should have been allowed to remain living with the Pattersons, rather than being "imprisoned" at the Santa Clara County Children's Shelter and then later in foster care (with the Pattersons).

- Relatedly, plaintiff generally contends that the social worker defendants denied him access to the courts. Plaintiff appears to argue that he was denied access to the juvenile dependency courts because those courts sustained the dependency petitions.

- Miles falsely petitioned the juvenile court because the allegations in the petition did not show any evidence that plaintiff's mother physically or sexually abused plaintiff.

- Miles did not do anything about the incidents that allegedly occurred during the month that plaintiff lived at the Santa Clara Children's Shelter.

- Miles, Saiprasert, Eddy and Nguyen allegedly did not respond to plaintiff's complaints that the Pattersons assigned him the chore of taking care of their pet rabbits, and that the Pattersons told plaintiff that he was a "drain on their financials" and was "ruining their marriage."[15]

- Miles allegedly caused plaintiff to miss an unspecified number of visits with his mother, his sister, I., and Mr. Wittman, and relatedly, unspecified social workers denied plaintiff his right to associate with his siblings, his mother, and Mr. Wittman.

- Miles, Saiprasert, Eddy and Nguyen allegedly did not help plaintiff reunify with his mother.

- "[A]lthough Grigsby and Chan did not act directly on Plaintiff's Juvenile Dependency Court action, their unlawful acts with his sibling's case [plaintiff's brother J.] denied him his right to his family which he suffered greatly until he was 18 and still suffers as his youngest sister was adopted lost to him forever."  Opposition at 11-12.

- Unspecified defendants interfered with his right to seek help through the California State Fair hearing process.

Defendants contend that the social workers involved in plaintiff's case are entitled to absolute and qualified immunity.  Defendants further argue that the supervisory defendants cannot be held liable under a theory of *respondeat superior*, and that defendants Chan and Grigsby had no involvement in plaintiff's case.

---

[15]  Plaintiff testified to these issues during his deposition.  It is unclear whether plaintiff is challenging his placement with the Pattersons, as his opposition to the motion for summary judgment does not discuss these claims.  In light of plaintiff's pro se status, and in the interest of resolving all issues, the Court assumes that plaintiff does contend that the social workers violated his rights by failing to respond to these alleged complaints about the Pattersons.

United States District Court
For the Northern District of California

**A.      Absolute immunity**

"[S]ocial workers are entitled to absolute immunity in performing quasi-prosecutorial functions connected with the initiation and pursuit of child dependency proceedings." *Meyers v. Contra Costa County Dep't of Social Servs.*, 812 F.2d 1154, 1157 (9th Cir. 1987).  In making this determination, the Court evaluates the "nature of the function performed, not the identity of the actor who performed it." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993); *Miller v. Gammie*, 335 F.3d 889, 898 (9th Cir. 2003) (en banc).  State actors, including social workers, who perform functions that are "critical to the judicial process itself" are entitled to absolute immunity.  *Miller*, 335 F.3d at 896 (citing *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)).  "Beyond those functions historically recognized as absolutely immune at common law, qualified and only qualified immunity exists."  *Id.* at 897.

In *Doe v. Lebbos*, 348 F.3d 820 (9th Cir. 2003), the Ninth Circuit held that a social worker was entitled to absolute immunity for allegedly failing to investigate adequately the allegations of abuse and neglect against a father and in allegedly fabricating evidence in a child dependency petition because those actions had the "'requisite connection to the judicial process' to be protected by absolute immunity." *Id.* at 826 (quoting *Miller*, 335 F.3d at 896).  The *Lebbos* court held that the social worker was entitled to qualified immunity for claims related to the social worker's detention of the child prior to the child dependency proceedings, and for a claim regarding the social worker's referral of the child for a sexual abuse examination without court order or parental consent.  *Id.* at 826-29.

Here, the social worker defendants are absolutely immune with respect to plaintiff's claims regarding the filing of the protective custody warrant, the initiation of the dependency proceedings, and actions taken in connection with the dependency proceedings, such as the social workers' recommendation to terminate reunification services between plaintiff and his mother.  These are all actions directly connected to the dependency proceedings, and are either "advocatory or quasi-judicial." *Meyers*, 812 F.2d at 1157 (social worker absolutely immune for initiating dependency proceedings and all testimony given during dependency and custody proceedings); *see also Beltran v. County of Santa Clara*, 491 F.3d 1097, 1100-01 (9th Cir. 2007) (social workers absolutely immune for filing allegedly

1    falsified dependency and custody petitions).[16]

2

3    **B.    Qualified immunity**

4    To the extent plaintiff challenges actions that are not connected to the dependency proceedings

5    – such as plaintiff's placement in the Children's Shelter for one month, the social workers' alleged

6    failure to investigate complaints about the Pattersons, alleged interference with plaintiff's visitation with

7    his mother, siblings and Mr. Wittman, and the social workers' alleged failure to assist plaintiff with

8    accessing the California State Fair hearing process – the Court assesses whether the social workers are

9    entitled to qualified immunity. *See Miller*, 335 F.3d at 898 (suggesting that "decisions and

10   recommendations as to the particular home where a child is to go or as to the particular foster parents

11   who are to provide care" should be evaluated under qualified immunity analysis, not absolute

12   immunity).

13   In making this determination, the Court first determine whether plaintiff has alleged a violation

14   of a constitutional right. Under *Saucier v. Katz*, 533 U.S. 194, 200 (2001), the Court must evaluate

15   whether, viewed in the light most favorable to plaintiff, the facts alleged show that the social workers'

16   actions violated a constitutional right. If they did, the Court evaluates whether the constitutional right

17   was "clearly established" such that it would have been clear to a reasonable social worker that the

18   conduct was unlawful. *Id*. at 201-02. This second inquiry "must be undertaken in light of the specific

19   context of the case, not as a broad general proposition. . . ." *Id*. at 201.

20

21   **1.    Placement in Children's Shelter and with the Pattersons**

22   Here, plaintiff alleges that his Eighth Amendment right to be free from cruel and unusual

23   punishment was violated when he was placed in the Children's Shelter. Relying on *Nicini v. Morra*,

24   ───────────────

25   [16] The Court notes that although the social workers are entitled to absolute immunity for claims that they filed false dependency and custody petitions, the record does not show, in fact, that the social workers fabricated evidence. Plaintiff contends that the social workers lied because there was no evidence that plaintiff's mother was sexually or physically abusing him. However, the social workers never represented to the juvenile court that plaintiff's mother was sexually or physically abusing plaintiff. Instead, the social workers represented to the juvenile court that plaintiff and J. sodomized their sister, that plaintiff and J. had engaged in sexual activity with each other, and that plaintiff's mother had failed to protect plaintiff and his siblings from sexual abuse.

United States District Court

For the Northern District of California

1   212 F.3d 798 (3d Cir. 2000), defendants argue that this claim should be evaluated under a Fourteenth

2   Amendment substantive due process standard.  In *Nicini*, the Third Circuit joined four other circuits[17]

3   in holding that foster children have a substantive due process right to be free from harm at the hands of

4   state-regulated foster parents, and that such claims are evaluated under a "shocks the conscience"

5   standard.  *Id*. at 807, 810.  In *Nicini*, a former foster child brought a § 1983 claim against a social

6   worker, claiming that the social worker violated his due process rights by placing him with a foster

7   parent who gave him drugs and alcohol and sexually abused him.  *Id*. at 800.  The court held that the

8   plaintiff failed to show a constitutional violation because the social worker conducted the required

9   investigation of the foster parent, and the record "reveals little from which [the social worker] could

10   have inferred that Nicini faced a 'substantial risk of serious harm.'" *Id*. at 813 (quoting *Farmer v.*

11   *Brennan*, 511 U.S. 825, 837 (1994)).  This Court finds the *Nicini* court's analysis persuasive, and

12   accordingly adopts the "shocks the conscience" standard to evaluate plaintiff's claim.

13         Here, the Court holds that plaintiff has not established that his constitutional rights were violated

14   either by his placement in the Children's Shelter or with the Pattersons, and thus defendants are entitled

15   to qualified immunity on these claims.  The Court recognizes that plaintiff's experience at the Children's

16   Shelter was difficult and emotionally stressful.  Accepting plaintiff's version of events as true, the Court

17   also finds it unfortunate that plaintiff was attacked by other residents at the shelter.  However, the facts

18   do not show that Miles was deliberately indifferent to plaintiff's rights.  As an initial matter, the Court

19   notes that Miles states in her affidavit that plaintiff never complained to her about any incidents during

20   his one month stay at the shelter.  *See* Miles Aff. ¶ 10.  Even if he did, however, the record does not

21   show that Miles should have thought that plaintiff faced a "substantial risk of serious harm."  Miles

22   states she was aware of the incident when plaintiff's finger was slammed in a door because she received

23   an incident report from the shelter; that report states that plaintiff received prompt medical attention.

24   Miles Aff. Ex. Q.  In his deposition, plaintiff testified that the other incidents occurred in the presence

25   of counselors who intervened either by verbally counseling the residents involved and/or physically

26   separating plaintiff and the other resident.  Kiniyalocts Aff. Ex. E at 43-46.  Thus, even if Miles was

---

27

28         [17]  The parties did not cite, and the Court could not locate, any Ninth Circuit authority on this issue.

United States District Court
For the Northern District of California

1    aware of the other incidents, the circumstances of those incidents would not suggest that plaintiff faced

2    a substantial risk of serious harm.

3          With regard to plaintiff's placement with the Pattersons, plaintiff does not contend that he was

4    abused or otherwise harmed by the Pattersons.  Instead, he contends that social workers did not

5    adequately respond to his complaints about having to do certain chores at the Pattersons' house, and

6    about the Pattersons allegedly telling plaintiff that he was putting a strain on their finances and marriage.

7    The Court first notes that the voluminous record in this case shows that plaintiff repeatedly reported that

8    he liked living with the Pattersons, and the status reports indicate that the Pattersons provided plaintiff

9    with a safe, stable environment, and that they were committed to helping plaintiff.  In any event, even

10   assuming plaintiff raised these concerns to the social workers, the Court finds that these facts do not rise

11   anywhere close to showing that the social workers were deliberately indifferent to plaintiff's due process

12   rights.

13

14                          2.       Visitation

15         Plaintiff also contends that the social worker defendants interfered with his visitation rights

16   and/or his right to associate with his mother, siblings, and Mr. Wittman.  Plaintiff generally asserts that

17   "absent exigent circumstances, he had the absolute right to associate freely with his family."  Opposition

18   at 7.  Plaintiff does not cite any authority for this proposition, and to the contrary, Ninth Circuit authority

19   suggests that plaintiff's claim should be evaluated under a substantive due process framework.  *See*

20   *Brittain v. Hansen*, 451 F.3d 982, 994-95 (9th Cir. 2006) (holding non-custodial parent with visitation

21   rights had liberty interest in visitation, and evaluating claim of interference with visitation as substantive

22   due process claim).

23         The Court finds that plaintiff has failed to demonstrate that his constitutional rights were

24   violated, and accordingly that defendants are entitled to qualified immunity on this claim.  The record

25   amply demonstrates that there was good cause to remove plaintiff and his siblings from his mother's

26   custody.  The record shows that plaintiff and his brother J. sodomized their nine year old sister, plaintiff

27   forced his sister to orally copulate him, and plaintiff and J. orally copulated each other; although

28   plaintiff's mother sought counseling for her children, she also stated her belief that such activity was

**United States District Court**
For the Northern District of California

1   "consensual," evidencing an inappropriate and inadequate response to a serious situation.  In addition,

2   as detailed above, the jurisdictional report prepared by Miles (and entered into evidence by the juvenile

3   court) contained extensive information showing that plaintiff's mother was unable to adequately care

4   for plaintiff and his siblings.

5          Once the juvenile court took jurisdiction over plaintiff, the juvenile court allowed visitation

6   between plaintiff and his mother, and eventually between plaintiff and Mr. Wittman.  Plaintiff has not

7   submitted any evidence that any social worker caused him to miss appointments with his mother, or that

8   any social worker acted improperly to otherwise "interfere" with his rights.  To the contrary, the status

9   reports prepared by the social workers for the juvenile court show that the social workers  monitored

10  plaintiff's case and made appropriate recommendations regarding visitation.  To the extent the social

11  workers recommended (and the juvenile court ordered) less visitation than plaintiff wished, the record

12  shows the reasonableness of the social workers' recommendations.  For example, numerous status

13  reports note that plaintiff's therapists, social workers, and Mrs. Patterson all expressed concerns that

14  plaintiff's mother was not acting properly during supervised visits.  Further, one status report mentions

15  that plaintiff's mother attempted to kidnap plaintiff's half-sister, I., and another reports that Mr. Wittman

16  was giving plaintiff money without his mother's knowledge.   The Court finds that plaintiff has not

17  demonstrated any constitutional violation.  *See Brittain*, 451 F.3d at 994-95 (holding non-custodial

18  parent with visitation rights did not show constitutional violation, or any "conscience-shocking" act by

19  defendant, when parent alleged that defendant police officer deprived her of one week of visitation).

20         Similarly, plaintiff has failed to show that defendants deprived him of any constitutional right

21  with respect to visitation with his siblings.  The juvenile court never ordered sibling visitation, and

22  several of the social worker status reports state that plaintiff told the social workers that he did not want

23  any visitation with his siblings.  *See* April 6, 2001 Report (Eddy Aff. Ex. S); June 9, 2003 Report

24  (Nguyen Aff. Ex. Z).  In addition, although not required to do so, Miles made arrangements for plaintiff

25  to see his youngest sister, I., in November and December of 1999, and January 2000.  Miles Aff. Ex.

26  RR.  When plaintiff expressed that he wished to see his brother, J., the social worker referred him to

27  counseling to address the issues between plaintiff and J.; plaintiff failed to go through with therapy.

28  Plaintiff has failed to submit any evidence suggesting that the social workers acted improperly.

### 3.    California Fair Hearing

Plaintiff asserts that unspecified defendants interfered with his right to seek help through the California State Fair Hearing process.  In support of this claim, plaintiff has submitted a January 28, 2000 Decision from the California Department of Social Services dismissing a claim filed by *plaintiff's mother* on the ground that the issues raised by the claim were not within the jurisdiction of a state hearing.  Chambers Decl. Ex. D.[18]  Plaintiff has not submitted any evidence showing that defendants interfered with this process in any way, and more importantly, this Decision states on its face that the Department of Social Services did not have jurisdiction over the claim, and thus plaintiff can not establish that any "right" was violated.

### 4.    Supervisory social workers and defendants Chan and Grigsby

In addition to the above-stated reasons for granting summary judgment in favor of the defendant social workers, the Court finds that defendants Platner, Castaldi, Weinberg, Paulsen and Guesick are also entitled to summary judgment because there is no *respondeat superior* liability under Section 1983.  *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Plaintiff's opposition does not specifically address any of these defendants.  However, plaintiff repeatedly reiterates that "Social Worker Supervisor Defendants . . . are responsible for the approval of the Social Worker's report . . . . and these Supervisors signed the Social Workers report, directly linking them to the violations which occurred to Plaintiff."  Opposition at 12.  Accordingly, it appears that plaintiff seeks to hold the supervisory social worker defendants liable as supervisors.

Finally, defendant has alleged claims against defendants Chan and Grigsby, both of whom were J.'s social workers and did not work on plaintiff's case.  Plaintiff has not submitted any evidence that either defendant violated any of plaintiff's constitutional rights.  Accordingly, the Court finds these defendants are additionally entitled to summary judgment on this ground.

---

[18]    The Court notes that "Florencio Maning" is listed as plaintiff's mother's authorized representative.  Defendants assert, and plaintiff does not dispute, that Mr. Maning is the same Florencio Maning who was convicted of committing lewd and lascivious acts on a child under the age of 14 years.

19

**United States District Court**
For the Northern District of California

## II.     Claims against attorney defendants

Plaintiff has sued numerous attorneys employed by the Santa Clara Office of the County Counsel and the Santa Clara District Attorney's Office.  Defendants Heggie, Ware and Rossi, all of the County Counsel's Office, were assigned at various stages of plaintiff's dependency proceedings to represent DFCS and the social worker defendants.  Defendant Ravel is the County Counsel for the County of Santa Clara, and it appears that plaintiff has sued Ravel in her supervisory capacity.  Defendants Allen and Adams, both of the District Attorney's Office, never represented plaintiff.[19]

Plaintiff generally contends that the attorney defendants "actively and aggressively sided with the Social Workers [and that this] is evidence that while [the attorney defendants] knew Plaintiff's mother filed many documents with the Juvenile Court trying to correct the misinformation, they refused to investigate her evidence."  Opposition at 13:19-23.  Plaintiff also contends that the attorney defendants are not entitled to summary judgment because they did not object to the acts of the social worker defendants.

The Court finds that the attorney defendants are entitled to absolute immunity.  The Court of Appeals for the Second Circuit in *Walden v. Wishengrad*, 745 F.2d 149, 152 (1984), held that an attorney working for a county agency is entitled to absolute immunity for actions arising out of the performance of his or her duties.  The court further emphasized that an government attorney working in the realm of social services, "must be allowed to perform [his or her] duties free from fear of potential lawsuits by individuals allegedly harmed by her actions." *Id*.  The Court finds *Wishengrad* persuasive, and holds that defendants Heggie, Ware and Rossi, acting in the scope of their duties as related to juvenile dependency proceedings, are entitled to absolute immunity.  Plaintiff has not submitted any evidence that defendant Ravel had anything to do with plaintiff's case, and defendant Ravel cannot be held liable under *respondeat superior*. *See Taylor*, 880 F.2d at 1045.  Finally, plaintiff has not presented any evidence regarding defendants Allen and Adams, and thus these defendants are also entitled to summary judgment.

---

[19]  On May 25, 1999, during the initial juvenile court hearing after plaintiff's detention, the District Attorney's Office declared a conflict of interest and did not represent plaintiff during the dependency proceedings.  Request for Judicial Notice Ex. C.

1    **III.    Claims against Department Directors and Board of Supervisors**

2        Plaintiff has sued current and former directors of the Department of Social Services and the

3    DFCS, as well as members of the Santa Clara County Board of Supervisors.[20]  Plaintiff alleges that the

4    directors and supervisors did not investigate complaints by his mother and Mr. Wittman about allegedly

5    false reports submitted by the social workers in plaintiff's dependency proceedings.  Plaintiff generally

6    contends that these defendants "knew what was going on" and that they did nothing.  In support of these

7    claims, plaintiff has submitted copies of letters and e-mails written by Mr. Wittman and plaintiff's

8    mother to various director and supervisor defendants, and the responses thereto.  Plaintiff also has

9    submitted the minutes of a Board of Supervisors Meeting which shows that Mr. Wittman attended a

10   meeting and complained about plaintiff's and his siblings' dependency cases.  Chambers Decl. Ex. K,

11   L, and M.

12       Plaintiff has failed to submit any evidence showing that any director or supervisor violated his

13   constitutional rights.  The fact that plaintiff, his mother, and/or Mr. Wittman were dissatisfied with the

14   responses they received to their complaints does not amount to a constitutional violation.  Plaintiff

15   generally asserts that these defendants knew or should have known about the alleged misconduct of the

16   social worker defendants; however, as set forth above, the Court finds that the social worker defendants

17   did not violate plaintiff's rights.

18

19   **IV.    *Monell* claim against County**

20       Plaintiff alleges that the County has a policy or practice of (a) denying children and parents their

21   constitutional rights; (b) removing children from non-abusive, non-offending parents and crafting court

22   reports with false petitions; and (c) neglecting duties and obligations mandated by law.  Opposition at

23   18-19.  Aside from the evidence related to his own case, plaintiff has submitted three declarations from

24   three women who were allegedly told by social workers handling their children's dependency matters

25   that the women would not regain custody of their children if they continued to live with their

26   husbands/boyfriends.  Plaintiff has not submitted any evidence regarding the details of these other

27

28   [20] These defendants are Will Lightbourne, Yolanda Rinaldo, Norma Sparks, Leroy Martin, Ken
     Borelli, Don Gage, James Beall, Blanca Alvarado, Pete McHugh, and Liz Kniss.

dependency cases.

The Court concludes that plaintiff's *Monell* claim fails.  In *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978), the Supreme Court held that municipalities such as the County are "persons" within the meaning of 42 U.S.C. § 1983.  *Monell* announced the following standard governing the liability of a municipality under Section 1983:

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edits or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible for under § 1983.

*Id.* at 694.  Plaintiff has not identified an official policy or a decision by an authorized decisionmaker sanctioning unconstitutional interference with parental rights.  To the extent plaintiff contends that the County has a custom of removing children from non-abusive, non-offending parents and crafting court reports with false petitions, plaintiff has failed to raise a triable issue of fact on this issue for all of the reasons set forth above.  Most importantly, the facts surrounding plaintiff's own case do not show the existence of such a custom because the record demonstrates that there was a basis for removing plaintiff and his siblings from his mother's custody.  The three declarations submitted by plaintiff do not contain any information about whether the children involved in the dependency proceedings were removed, and if so, under what circumstances and for what reasons.  Accordingly, the Court grants summary judgment in favor of defendants.

**V.    State law claims**

Plaintiff has alleged the following state law "claims": "damages based on defendants' malicious acts, intentional infliction of emotional distress and perjury with malice and reckless disregard of the rights and safety of plaintiff," negligence, and "tortious act of employee within scope of employment." Second Amended Complaint (First, Eighth and Ninth Causes of Action).

Plaintiff generally contends that the social worker defendants[21] are not immune under California

---

[21] Although the state law claims are alleged against all defendants, plaintiff's opposition focuses on the social worker defendants.  In any event, plaintiff has failed to submit evidence raising a triable issue of fact on the state law claims as to any defendant.

22

United States District Court
For the Northern District of California

law pursuant to California Government Code Section 820.21, titled "Juvenile court and child protection workers; exceptions to immunity; malice." That section states,

> (a) Notwithstanding any other provision of the law, the civil immunity of juvenile court social workers, child protection workers, and other public employees authorized to initiate or conduct investigations or proceedings pursuant to Chapter 2 (commencing with Section 200) of Part 1 of Division 2 of the Welfare and Institutions Code shall not extend to any of the following, if committed with malice:
>
> (1) Perjury.
>
> (2) Fabrication of evidence.
>
> (3) Failure to disclose known exculpatory evidence.
>
> (4) Obtaining testimony by duress, as defined in Section 1569 of the Civil Code, fraud, as defined in either Section 1572 or Section 1573 of the Civil Code, or undue influence, as defined in Section 1575 of the Civil Code.
>
> (b) As used in this section, "malice" means conduct that is intended by the person described in subdivision (a) to cause injury to the plaintiff or despicable conduct that is carried on by the person described in subdivision (a) with a willful and conscious disregard of the rights or safety of others.

Cal. Gov't Code § 820.21. As the Ninth Circuit has noted, Section 820.21 "purports to strip social workers of absolute immunity from liability for perjury, fabrication of evidence, and failure to disclose exculpatory evidence if committed with malice." *Beltran*, 491 F.3d at 1102 (rejecting contention that § 820.1 affected social worker immunity under federal law).

Plaintiff asserts that the social worker defendants allegedly withheld from the juvenile court various documents relating to himself, his siblings, or his mother. Plaintiff has attached these documents to his declaration. *See* Chambers Decl. Ex. B, H, N, Q, R, T, GG. As defendants correctly note, plaintiff has not authenticated any of these documents. In addition, there is no evidence that defendants were aware of many of the documents. However, even if the exhibits were admissible, they do not show that the social workers should be stripped of their immunity. For example, one document relates to plaintiff's mother completing a parenting class, and is dated November 11, 2005 – 16 months after plaintiff's dependency case was dismissed. Most of the other documents relate to plaintiff's siblings, such as a medical report for M. showing she was examined on April 19, 1999 for a possible sexually transmitted disease, and psychological reports for J. The existence of these documents does not in any way suggest that defendants acted with malice to commit perjury, fabricate evidence, fail to

United States District Court
For the Northern District of California

1    disclose known exculpatory evidence, or obtain testimony by duress.

2          For these reasons, and all of the reasons stated above in connection with plaintiff's other claims,

3    the Court finds that defendants are entitled to summary judgment on defendants' state law claims.

4

5                                              **CONCLUSION**

6          For the reasons set forth above, the Court GRANTS defendants' motion for summary judgment.

7    (Docket No. 81).  The Court GRANTS defendants' request for judicial notice.  (Docket No. 83).  In light

8    of the disposition of this case, the Court DENIES AS MOOT plaintiff's request for a protective order.

9    (Docket No. 95).  Defendants have objected to numerous exhibits submitted by plaintiff.  Although

10   defendants are correct that plaintiff has failed to authenticate various letters and social worker logs, the

11   Court has considered those documents in connection with the instant motion.  Many of the documents

12   – such as communications between plaintiff's mother, Mr. Wittman, and the County Board of

13   Supervisors and Director defendants – are considered not for the truth of the matter, but simply as

14   evidence that complaints were filed and responded to.  The Court SUSTAINS defendants' objections

15   to Exhibits B and F as there is no indication from the face of the documents who the author is, or how

16   the document were created. (Docket No. 101).

17

18         **IT IS SO ORDERED.**

19

20   Dated: November 26, 2007

21                                                    SUSAN ILLSTON
                                                     United States District Judge

22

23

24

25

26

27

28